405 S.E.2d 858

**Vallie RICH, Plaintiff Below, Appellant,**

v.

**Donald K. RICH and Tammy J. Rich, Husband and Wife, Defendants Below, Appellees.**

No. 19675.

Supreme Court of Appeals of West Virginia,

Submitted Jan. 15, 1991.

Decided May 24, 1991.

Mark D. Nigh, Philippi, for appellant.

Kathryn M. Schuppener, Elkins, for appellees.

WORKMAN, Justice:

Vallie Rich appeals from a decision of the Circuit Court of Randolph County dismissing the civil action which she filed against her former husband, Donald K. Rich, and his wife, Tammy J. Rich, in which Vallie Rich sought to set aside her former husband's transfer of certain real estate to his second wife. In the complaint, Vallie Rich alleged that Donald Rich effected the transfer of property with the intent to defraud her. Due to a child support arrearage, Vallie Rich was a creditor of Donald Rich at the time of the property transfer. Having reviewed the record in this case in conjunction with pertinent principles of law, we reverse the circuit court's order on the grounds that Mr. Rich's transfer of property to his second wife was made under circumstances which strongly suggest fraud both at common law and pursuant to the Uniform Fraudulent Transfers Act ("Act"), W.Va.Code §§ 40–1A–1 to –12 (Supp.1990). Accordingly, Vallie Rich's complaint was improperly dismissed.

The record in this case discloses that Vallie and Donald Rich were divorced on January 2, 1985. Vallie had two children by a former husband and a third child by virtue of an extramarital liaison with Mr. Rich prior to their marriage. All three children were adopted by Mr. Rich during his marriage to Vallie Rich, and pursuant to the final order of divorce, all three of the children were placed in her custody. For some unspecified reason, a child support order was not entered until more than four months after the final order of divorce was entered. The child support order required Mr. Rich to pay $150 per month for each of the three children.

On May 13, 1985, the same day child support was initially ordered to be paid, Mr. Rich initiated proceedings to revoke his adoption of the two children born of Vallie Rich's first marriage. The circuit court granted Mr. Rich's revocation petition and Vallie Rich appealed that decision to this Court. We reversed the lower court's ruling based on Mr. Rich's failure to demonstrate fraud as to him with respect to the adoptions. *See Rich v. Rich,* 178 W.Va. 791, 364 S.E.2d 804, ₄805 (1987).

Several months prior to this Court's ruling upholding the adoptions, a family law master found Mr. Rich $945 in arrears for child support payments by order entered on September 14, 1987. On September 28, 1987, just two weeks after the arrearage order was entered, Mr. Rich transferred the property at issue to his new wife. On March 10, 1988, the Child Advocate's Office determined that Mr. Rich was in arrears for the amount of $11,436.80 [1] based on his

---

1. While the record does not disclose any explanation for the large increase in the arrearage between September 14, 1987, and March 10, 1988, we assume that the increased figure is due in part to this Court's ruling that the adoptions were valid. Since the second arrearage figure is

failure to pay child support for all three children. The Child Advocate's Office ordered Mr. Rich to pay $150 per month for each child plus ten percent of his disposable income toward the arrearage.

In October 1988, Vallie Rich instituted a civil action against Mr. Rich and his wife seeking to have the transfer of two tracts of real estate located on Middle Mountain in Dry Fork District, Randolph County, West Virginia, set aside on grounds that the conveyances were made with the intention to defraud Vallie Rich. Based on the September 14, 1987, order declaring the child support arrearage, Vallie Rich argues that she was a judgment creditor of Mr. Rich at the time of the transfer. After conducting a brief hearing on September 11, 1989, wherein the circuit court heard arguments of counsel but did not take any testimony, the court dismissed Vallie Rich's civil action. The dismissal order is devoid of any grounds for the court's decision to dismiss this civil action other than a reference to the September 11, 1989, hearing.

The transcript from the circuit court hearing suggests that in making its decision to dismiss the complaint, the court relied heavily on the fact that an outstanding $18,700 deed of trust remained on the property at issue. Without taking any evidence on this issue, however, the court determined *sua sponte* that there was no remaining equity in this property. Despite a representation by Vallie Rich's counsel that an appraisal of the subject property indicated that it was worth approximately $30,000 to $35,000, which would have indeed suggested available equity in the property, the court summarily dismissed the civil action. The only explanation for the court's ruling was its brief reference to the deed of trust and the statutory homestead exemption.[2]

Although both parties failed to consider the effect of the Uniform Fraudulent Transfers Act, we find the Act to be both applicable and controlling with regard to this case. The Act makes transfers, which are defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance" fraudulent if made under certain circumstances. W.Va.Code § 40–1A–1($l$). The Act provides that

(a) [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay or defraud any creditor of the debtor; or

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor:

(i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) Intended to incur, or believed or reasonably should have believed that he (or she) would incur, debts beyond his (or her) ability to pay as they became due.

W.Va.Code § 40–1A–4(a).

The Act identifies the following list of expressly noninclusive factors to aid "[i]n determining actual intent under subdivision (1), subsection (a):"

(1) The transfer or obligation was to an insider;

based on Mr. Rich's failure to pay child support for three children, we further assume that the first arrearage order pertained to child support payments for only one child.

**2.** *See* W.Va.Code § 38–9–1 (1985) which provides for a "husband, wife, parent or other head of a household" to have a $5,000 homestead exemption.

Additionally, the court did comment that Mr. Rich could "give his property away if he wants to," and further suggested that Mr. Rich was wrongly being required to pay child support for the two children whom he had adopted, since they were "not even his kids." The adoptions having previously been determined by this Court to be valid, we see no further need to address that matter.

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred;

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

W.Va.Code § 40–1A–4(b).

Before we analyze whether the transaction was fraudulent under the Act, we must first determine that the Act applies to the parties at issue in this dispute. We find no provision in the Act which would preclude its applicability to transfers of property between relatives, such as the husband-to-wife transfer involved in this case. In fact, the Act clearly contemplates such transfers by including the term "relative" and by designating relatives of an individual debtor as "insiders" within its definitional provisions. *See* W.Va.Code § 40–1A–1(k), –1(g)(1)(i). Accordingly, we hereby find that an interspousal transfer of property is clearly subject to the Act.

In determining whether the subject transfer was fraudulent under the Act, it is also necessary to examine whether the property which was transferred is exempt from the Act's provisions. The term "transfer," by definition involves "an asset

or an interest in an asset." W.Va.Code § 40–1A–1(*l* ). Accordingly, the Act would not apply if the conveyed property were determined not to qualify as an "asset." The Act defines an "asset" as:

(b) property of a debtor, but the term does not include:

(1) Property to the extent it is encumbered by a valid lien;

(2) Property to the extent it is generally exempt under nonbankruptcy law; or

(3) An interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant.

W.Va.Code § 40–1A–1(b).

By exempting property encumbered by a valid lien from qualifying as an asset, the Act codifies what the circuit court was attempting to do in calculating *sua sponte* whether there was any equity in the subject property. Accordingly, that portion of the property encumbered by the $18,700 lien is clearly not an asset subject to fraudulent transfer. *See* W.Va.Code § 40–1A–1(b)(1). Similarly, another $5,000 of the property's value is not an asset due to the homestead exemption. *See* W.Va. Code § 40–1A–1(b)(2). Therefore, it is our opinion that any equity in the property above the combined amount of the outstanding mortgage lien and the $5,000 homestead exemption could be viewed as an "asset" under the Act. The circuit court's hastiness in dismissing this case without taking any evidence regarding the property's equity precludes us from declaring at this point whether in fact there is any equity in the property which would permit a portion of the property to qualify as an "asset." This issue must be resolved on remand.

Assuming, *arguendo*, that the property or a portion of the property constitutes an "asset," the next determination to be made is whether Mr. Rich's transfer of property to his second wife was made "[w]ith actual intent to hinder, delay or defraud any creditor" or "[w]ithout receiving a reasonable equivalent value in exchange for the transfer." W.Va.Code § 40–1A–4(a)(1), (2). An

examination of the factors delineated by the Act for guidance in resolving the "actual intent" issue suggests that Mr. Rich's transfer was made with intent to defraud his ex-wife in her judgment creditor status. The factors which we find evident in this case include the following:

(1) The transfer was to an insider;

(2) The debtor retained possession and control of the property following the transfer;

(3) Before the transfer was made, the debtor had been sued;

(4) The transfer was of substantially all the debtor's assets;

(5) The transfer was effected without the debtor receiving a reasonably equivalent value in exchange for the transfer;

(6) The debtor was insolvent or became insolvent shortly after the transfer was made; and

(7) The transfer occurred shortly before or after a substantial debt was incurred.

*See* W.Va.Code § 40–1A–4(b).

■ The fact that seven of the eleven factors supplied by the Act to determine "actual intent" appear to have been present in Mr. Rich's case strongly suggests that the transfer at issue was indeed a conveyance effectuated with intent to defraud his creditors. Vallie Rich qualifies as a creditor under the Act since a creditor is defined as "a person who has a claim" and a claim is further defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." W.Va. Code § 40–1A–1(d), (c). This broad definition of a creditor clearly includes Vallie Rich who had obtained a court order finding Donald Rich to be in arrears for child support payments at the time of the transfer.

As a creditor of Mr. Rich, the Act entitles Vallie Rich to protection from fraudulent transfers. In concluding that the transfer at issue appears fraudulent within the meaning of the Act, we rely on those seven previously enumerated factors which tend to demonstrate "actual intent." The transfer was certainly suspect since it was to an "insider," a relative in this case, and furthermore because Mr. Rich continued to have both possession and control of the property following the transfer. The real property at issue included the former marital home of Vallie Rich and Donald Rich. Following his divorce from Vallie Rich and upon his remarriage, Mr. Rich continued to reside in this home. Likewise, his residence remained unchanged after he conveyed the property to his second wife.

The "facts" surrounding the $6,000 consideration allegedly paid by Tammy Rich for the property are arguably suspicious. Mr. Rich's explanation concerning payment of the alleged consideration, as taken from interrogatories in aid of execution, was that his new wife's parents wrote out a check to Tammy Rich for $6,000. She then signed the check over to Mr. Rich, who immediately gave the check back to his wife's parents to repay them for certain furnishings which they had purchased for the home occupied by Mr. Rich and their daughter.[3] No copy of this check was ever produced during the underlying proceedings. The proffered explanation regarding the consideration paid by Tammy Rich for the transferred property and appellees' failure to corroborate their factual account by producing a copy of the alleged check suggests that the transfer was effected without Mr. Rich receiving a reasonably equivalent value in exchange for the transfer while he knew or had reason to believe that "he ... would incur, debts beyond his ... ability to pay as they became due." W.Va.Code § 40–1A–4(a)(2)(ii).

---

**3.** Mr. Rich testified at his interrogatories in aid of execution that when Vallie Rich left the marital residence, she took the refrigerator, washer, dryer, all the furniture, silverware, rugs, beds, linens, tools, guns, vehicles, and even the kitchen sink. The money "borrowed" from Mr. Rich's new wife's parents allegedly went to pay for comparable replacement items.

■ Historically,

[w]here property is alleged to have been purchased by a wife, or a conveyance of property is made to her during coverture, the burden is upon her to prove distinctly that she paid for it with means not derived from her husband. Evidence, that she made the purchase, or that the property was conveyed to her, amounts to nothing, unless it is accompanied by clear and full proof that she paid for it with her own separate estate; and in the absence of such proof the presumption is that her husband furnished the means to pay for it and it will be subject to his debts.

Syl. Pt. 1, *McMasters v. Edgar*, 22 W.Va. 673 (1883). The second wife of Mr. Rich clearly did not meet her burden of establishing that she paid for the property transferred to her out of her own estate. Similarly lacking was evidence demonstrating that the "consideration" allegedly paid was a reasonable amount for the subject property. The limited evidence elicited certainly suggests that the alleged consideration transaction was merely a pretense. Assuming for the moment that a check did pass between the parties for the property, the explanation offered by Mr. Rich at his interrogatories in aid of execution makes it clear that the money was in fact repayment for a preexisting debt—the household furnishings—and not for the purchase of the marital home and accompanying parcels of real estate.

What particularly troubles us about this case is Mr. Rich's obvious attempt to shelter an asset in such close proximity to the entry of a child support arrearage order and during the pendency of an appeal before this Court, the outcome of which could and did significantly affect the amount of the previously ordered arrearage. Only two weeks after the initial arrearage order was entered, Mr. Rich transferred what appears to be his only substantial asset—his home and real estate—to his new wife. The explanation offered by Mr. Rich for

the transfer was that he was attempting to protect his new wife's interests in the event he should die.[4] Regardless of whatever altruistic intentions Mr. Rich may have had to protect his new wife, he did not have the right to shelter his only substantial asset from child support enforcement.

We find Mr. Rich's argument that he notified the Child Advocate's Office to determine whether they would attempt to foreclose on his real estate to recover child support arrearages prior to the transfer as totally irrelevant. Even if the Child Advocate's Office advised Mr. Rich that they would not force a sale of his property, this does not mean that Vallie Rich, as the custodial parent of the children to whom the obligation of support was owed, could not choose to force such a sale, assuming the existence of equity in the property and her establishment of priority as a lienholder entitled to that equity. Oral argument of this case revealed that although Mr. Rich was gainfully employed at the time these appeal proceedings were initiated and Vallie Rich was at that time receiving both child support and a percentage toward the arrearage, Donald Rich has since been laid off and Vallie Rich is currently not receiving any money for child support or arrearages.[5]

We also find unconvincing Mr. Rich's argument that he did not foresee an increase in the amount of ordered arrearage as a result of Vallie Rich's ultimately successful appeal to this Court on the adoption revocation ruling. The Act, in no uncertain terms, explains that a transfer effected without a reasonably equivalent value in exchange is fraudulent when the debtor "believed *or reasonably should have believed* that he (or she) would incur, debts beyond his (or her) ability to pay as they became due." W.Va.Code § 40–1A–4(a)(2)(ii) (emphasis supplied). Since an increase in arrearage was certainly a foreseeable outcome of the appeal, we conclude that it was reasonable for Mr.

4. At the time of his interrogatories in aid of execution which took place on September 22, 1988, Mr. Rich was 41 and Tammy Rich was 28.

5. As of August 9, 1988, the oldest of the three children turned 18. From that date forward, Mr. Rich was only required to pay child support for two children, excepting of course any arrearage which had previously accrued.

Rich to believe that he might incur debts he was unable to pay as they became due at the time of the transfer.

■ Notwithstanding the likelihood of the second arrearage order, there was already an arrearage order in effect two weeks prior to the date when Mr. Rich transferred the property. The timing of this transfer simply cannot be disregarded. The fact that it occurred two weeks after the first arrearage order was entered, while an appeal on a related matter was pending before this Court and shortly before a second arrearage order was entered cannot be overlooked. As the Act makes clear, the proximity of a transfer to the incurrence of a substantial debt is a factor indicative of "actual intent." An inter-spousal transfer of property in close proximity to the incurrence of a substantial child support obligation may constitute evidence of fraudulent intent under the Act and may result in the transfer being set aside pursuant thereto.

The final factor which suggests fraudulent intent is the debtor's insolvency. The historical presumption that a transfer between a husband and wife is subject to close scrutiny for fraudulent intent always required as a prerequisite that the debtor first be shown to be insolvent. The Act eliminates this step by establishing a presumption of insolvency for "[a] debtor who is generally not paying his (or her) debts as they become due...." W.Va.Code § 40–1A–2(b). Since an arrearage order had already been entered at the time of the transfer, the Act's presumption of insolvency would apply to Mr. Rich.

■ While our review of the factors provided by the Act on the issue of "actual intent" as they relate to this case suggests that the transfer of Mr. Rich's home and real estate was intended to defraud a creditor within the meaning of the Uniform Fraudulent Transfers Act, this is a determination that must be made by the trial court upon a taking of evidence on these issues. Upon remand, the circuit court must determine initially whether the subject property qualifies as an "asset" within the meaning of the Act. If the property can be properly characterized as an "asset," the circuit court must proceed to determine whether the transfer was effected without the exchange of consideration reasonably equivalent to the value of the transferred property at a time when Mr. Rich was not paying child support as it became due and when Mr. Rich had reason to believe that he might incur additional debts which he would not be able to timely pay. Under the Act, either "actual intent" to defraud or the absence of reasonably equivalent consideration will suffice to establish the requisite fraudulent intent necessary to set aside the transfer as fraudulent. Accordingly, the decision of the Circuit Court of Randolph County is hereby reversed and remanded for further proceedings consistent with this opinion.

Reversed and remanded with directions.